**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-0071-WJM-STV

PATRICIA HARRIS,

      Plaintiff,

v.

HON. ROBERT WILKIE of DOD, SECRETARY DEPARTMENT OF VETERANS
AFFAIRS, in his Official Capacity,

      Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND
MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Patricia Harris ("Harris") sues the Honorable Robert Wilkie, Secretary of

the Department of Veterans Affairs, in his official capacity ("the VA"), alleging age

discrimination in violation of the Age Discrimination in Employment Act ("ADEA"),

29 U.S.C. §§ 621 *et seq.*, and retaliation for exercising her rights under that statute.

(ECF No. 69.)

Currently before the Court is the VA's Motion to Dismiss Claim Three of the Third

Amended Complaint ("Motion to Dismiss") (ECF No. 74) and the VA's Motion for

Summary Judgment (ECF No. 86). The issues raised in the Motion to Dismiss are also

addressed, with citations to evidence, in the Motion for Summary Judgment. In this

light, it would be the height of formalism to address whether Harris has properly *pleaded*

a claim. Accordingly, the Motion to Dismiss is denied as moot. And, for the reasons

explained below the Motion for Summary Judgment is denied, this case remains set for

trial, and that trial will be to the Court, not a jury.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).[1]

---

[1] When trial will be to the Court, some circuits allow their district courts to resolve disputed factual questions at the summary judgment phase if the court can confidently say that presentation of live evidence would make no difference. *See, e.g.*, *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003); *Matter of Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991); *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 400–01 (1st Cir. 1988). Other circuits hold that the summary judgment standard remains the same regardless. *See, e.g.*, *Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Technical Sch.*, 817 F.2d 1310, 1315 (8th Cir. 1987); *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967). As far as this Court could locate, the Tenth Circuit has never addressed this question directly, but it appears to lean in favor of the latter view. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 949 (10th Cir. 2002) ("Although a district court can make factual findings related to laches after a bench trial, the court should not make factual findings when addressing a summary judgment motion based on laches . . . ." (citation omitted)). This Court will therefore apply the same summary judgment standard it would apply if the case were set for a jury trial.

## II.  FACTS

The following factual assertions are undisputed for summary judgment purposes, unless attributed to a party or otherwise noted.

### A.     Harris's Employment at the Denver CLC

Harris is a registered nurse and held various jobs in the nursing administration field from October 2006 to September 2015, when she was hired as "Nurse Manager" at the VA's Denver Community Living Center ("CLC").  (ECF No. 88 at 15–17, ¶¶ 1–9.)[2]  A CLC "is the VA's equivalent of a skilled and long-term care nursing facility."  (ECF No. 86 at 1, ¶ 2.)

Harris was 67 years old when she began working as Nurse Manager at the Denver CLC.  (*Id.* at 2, ¶ 5.)  At that time, her most recent experience providing direct nursing care to patients had been in 2007.  (*Id.* ¶ 7.)  Harris's job responsibilities included "managing the day-to-day operations of the Denver CLC, and managing the unit's financial, human, material, and informational resources."  (*Id.* ¶ 8.)  She was also responsible for "performance improvements and documentation audits."  (*Id.* at 3, ¶ 11.)

### B.     The December 2015 LTCI Audit

The Denver CLC was subject to both state and federal regulation by a number of oversight bodies and was also governed by rules and policies promulgated by the VA itself.  (*Id.* at 2, ¶ 4.)  In December 2015, a "consulting agency" known as the Long Term Care Institute ("LTCI") conducted an unannounced audit of the Denver CLC and identified four deficiencies that needed correction: (1) failure to carry out certain activities necessary to maintain good grooming; (2) failure to ensure that residents

---

[2] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits.

received necessary treatment and services to treat pressure ulcers; (3) failure to ensure that that the resident environment was free from hazards (such as fall hazards); and (4) failure to ensure that employees adequately implemented the infection prevention and control program. (*Id.* at 4–5, ¶¶ 27–29.) The LTCI's deficiency findings triggered a requirement that the Denver CLC address those deficiencies through "action plans" that outlined the remedial steps the facility would take. (*Id.* at 5, ¶ 30.) The CLC was also required to demonstrate progress toward correcting the deficiencies through regular, thoroughly documented, internal audits. (*Id.* ¶ 31.)

## C. Piper Knight

In May 2016, the VA hired Piper Knight, also a registered nurse, to be the Chief Nurse of Geriatrics and Extended Care for several facilities in the VA's Eastern Colorado Healthcare System, including the Denver CLC. (*Id.* at 3–4, ¶¶ 18–19, 22.) In this role, Knight became Harris's direct supervisor. (*Id.* at 3, ¶ 18.) Knight's duties included ensuring that each of the programs she oversaw was in regulatory compliance and prepared for unannounced site visits by oversight bodies. (*Id.* at 4, ¶ 23.)

From the outset, Knight treated Harris very poorly, including by frequently criticizing her (at times in front of other staff members), frequently speaking in a rude and demeaning way to her, and speaking over her while she (Harris) was attempting to speak to her staff. (ECF No. 88 at 26, ¶¶ 45, 47.) Harris says that Knight would provide Harris with instructions but later deny having given such instructions, and sometimes, later still, criticize Harris for failing to follow those previously-disavowed instructions. (ECF No. 86 at 31, ¶ 261; ECF No. 88 at 20, 22, 25, ¶¶ 21, 31, 41, 43.) Harris further asserts that, by contrast, Knight treated Harris's subordinates mostly respectfully. (ECF No. 86-2 at 187–90.) Harris's staff was mostly under age 40, although "[m]aybe a third"

were in their 40s and one or two were in their 50s.  (*Id.* at 191.)

In September 2016, Harris complained about Knight to Keith Harmon, whose title is "Nurse Executive," and Harris believes she accused Knight of nonspecific "discrimination."  (ECF No. 86 at 30, 33, ¶¶ 256, 276–78.)  Harris says that on this occasion, or perhaps on a second occasion, Harris's assistant manager accompanied Harris to express similar concerns, but Harmon seemed not to care.  (*See* ECF No. 88 at 10.)

Knight soon told Harris that she knew about the meeting with Harmon, but she herself did not care.  (ECF No. 86 at 33, ¶ 280.)  Knight continued to criticize and demean Harris.  (*Id.* ¶ 279.)

Around this same time, Knight made several statements to Harris about the Denver CLC and her intentions for it, including:

- she (Knight) had been hired "to fix the CLC" which was "falling apart";

- the Denver CLC looked good according to some metrics but "she could dig and find issues";

- she would "continue to micro manage until the culture of the CLC changed";

- "no one [at] the CLC respects her [Knight's] authority";

- she planned to "build her own team, this would take about a year, but it will happen"; and

- "if the CLC closed, the staff would have jobs in the hospital, and [Knight] would have a job because she managed 3 other departments, but [Harris] would be out of a job."

(*Id.* at 29–30, ¶¶ 248–51, 254.)  Harris and Knight also had a conversation in "the fall of 2016" in which Knight told Harris "that she would not be able to operate in the environment [Knight] was going to create."  (*Id.* at 32, ¶ 269.)  Knight used the term "fast-paced" or "dynamic" to describe that environment, although Harris cannot remember precisely which of those terms Knight used.  (*Id.*)

## D.  Harris's Potential Violation of Hiring Rules

In early October 2016, Knight observed one of Harris's immediate subordinates giving a tour of the Denver CLC to an unknown individual.  (*Id.* at 8, ¶ 60.)  Knight asked Harris who this person was, and Harris responded that she was the daughter of one of the nurses in Harris's unit, and someone whom she was interested in hiring ("the Candidate").  (*Id.* ¶ 61.)  Harris said she had already contacted the relevant nurse's union to see if the Candidate could be hired.  (*Id.* ¶ 62.)

Knight then investigated further by accessing a computer program known as "Selection Manager" that the VA uses for tracking hiring decisions.  (*Id.* at 9, ¶¶ 63–64.) Knight discovered that Harris had already designated the Candidate as "selected" in Selection Manager, but there was no information or documentation supporting this choice.  (*Id.* ¶¶ 65–66.)  Moreover, for Harris to have hired someone on her own would have contravened numerous VA procedures that required each employment candidate to be scored according to a "grid" of relevant factors and then interviewed and further scored by a panel of staff members.  (*Id.* at 8, ¶¶ 54–59.)

Knight asked Harris to turn over Harris's copies of the resumes, references, interview notes, and hiring grids for all candidates currently being considered.  (*Id.* at 9, ¶ 67.)  Only the Candidate's hiring grid had been filled out.  (*Id.* ¶¶ 68–69.)  Although other candidates had been interviewed, only the Candidate had been given an interview

score.  (*Id.* ¶ 70.)  Moreover, Harris had written "selected" in the "Notes" field for the Candidate's hiring grid.  (*Id.* ¶ 71.)  Knight also discovered that at least one other candidate was a veteran, and another was a current VA employee, thus requiring the VA to consider special rules about preference for veterans and current employees.  (*Id.* at 10, ¶¶ 76-77.)[3]

Knight asked Harris to explain how she had selected the Candidate without scoring the other candidates or completing the hiring grids.  (*Id.* ¶ 72.)  Harris responded that she was "not done" with the hiring process and that she had not formally selected the Candidate.  (*Id.* ¶ 73.)  Knight found this explanation non-credible.  (*Id.* at 10, ¶ 74.)

The record does not reveal what happened to the Candidate or any of her competitors, but the parties agree that "no other information [beyond marking the Candidate as 'selected'] was filled in in order to complete the selection process" and Knight took over the hiring process after discovering Harris's actions.  (ECF No. 88 at 21, ¶ 27.)

On November 1, 2016, a "fact finding" took place to inquire into the incident with the Candidate and "several other areas of [Harris's] job performance."  (ECF No. 86 at 10, ¶ 78.)  A fact finding is a relatively formal interview of an employee against whom the VA is considering discipline.  (*Id.* ¶¶ 79–80.)  At the conclusion of the interview, a document is prepared that reflects the questions asked and the answers given.  (*Id.* at 11, ¶ 82.)

_____

[3] Harris purports to deny these assertions, but really only objects that they are irrelevant because Harris had not actually finished the hiring process.  (*See* ECF No. 88 at 6.)  Accordingly, Knight's knowledge of these candidates and the special rules pertaining to them is deemed undisputed.

Human Resources Specialist Eric Winters assisted in drafting questions for this fact finding. (*Id.* ¶ 85.) It is not clear whom he was assisting, but Knight was not involved in the process. (*Id.* ¶ 84.)[4]

Faye Salas, Chief Nurse of Ambulatory Care, conducted the fact finding interview. (*Id.* ¶ 86.) Salas asked about the hiring process as it related to the Candidate, and "about other instances of potential misconduct, such as failure to follow certain supervisory directives." (*Id.* ¶¶ 87–88.) Salas then drafted the written report of questions and answers and provided it to Winters. (*Id.* ¶ 89.)

Winters investigated further about Harris's purported violation of VA hiring practices. (*Id.* ¶ 90.)

## E. Harris's Extra Responsibilities

While Winters was investigating, in December 2016, Harris's assistant manager (her immediate subordinate) left her employment at the VA. (ECF No. 88 at 7.) "Knight expected the bulk of [the assistant manager's] duties to be performed by Harris in addition to the other duties and responsibilities Harris had," including audit compliance and action plan supervision and reporting. (*Id.* at 21–22 ¶¶ 28, 31.) Harris explained to Knight that she was overwhelmed by all of the additional responsibility and "had neither the time nor resources to perform her own managerial responsibilities." (*Id.* ¶ 31.) Knight provided no assistance except for bringing in an additional nurse for one day. (*Id.* at 22–23, ¶¶ 31–32.)

---

[4] Harris nominally denies this, but then explains that Knight's "false accusations" (about the Candidate hiring process, apparently) were meant to provoke the fact finding. Whether Knight intended to provoke disciplinary proceedings is separate from whether she participated in formulating questions for the fact finding. Her non-participation in that task is therefore deemed undisputed.

**F.      Potential Discipline Considered**

Meanwhile, Winters had concluded that "the agency would likely propose disciplinary charges against [Harris] for engaging in a Prohibited Personnel Practice, lack of candor, failing to follow supervisory instructions, and careless performance of duties." (ECF No. 86 at 12, ¶ 91.)  He told Harris as much in early January 2017 and advised her that such charges "could potentially lead to a proposed removal." (*Id.* ¶ 92.) He proposed that Harris "could consider entering into an Alternative Dispute Agreement with the agency in lieu of any specific discipline," which "would require [Harris] to accept responsibility for her mistakes and to step down from her position as Nurse Manager." (*Id.* ¶ 93.)  Harris declined, and so Winters proceeded with developing the proposed disciplinary charges. (*Id.* ¶¶ 94–99.)

"Around this same time," Harris told Winters that she was unhappy with being Nurse Manager and wanted help to find another position within the VA. (*Id.* ¶ 95.) Winters suggested that Harris could move to a floor nurse position. (*Id.* ¶ 96.)  Harris rejected this possibility (*id.* ¶ 97), deeming it to be a demotion, and to be a product of "continuing humiliation and embarrassment" prompted by Knight (ECF No. 88 at 7). Harris also considered herself unqualified because she "didn't have bedside experience for years." (ECF No. 89 at 4, ¶ 97.)

It took some time for Winters to develop formal disciplinary charges against Harris due to the press of business and information from Knight that Harris "had ongoing performance issues." (ECF No. 86 at 13, ¶ 100.)  "When an employee may face multiple disciplinary charges, the VA's Human Resources department generally seeks to bring the potential disciplinary charges together at once, rather than issuing

separate charges in piecemeal fashion." (*Id.* ¶ 101.)[5]

## G. Job Performance Deficiencies

Harris underwent another fact finding on March 17, 2017. (*Id.* ¶ 102.) Knight herself conducted this interview, which focused on Harris's handling of audits and action plans, including the LTCI audit and a separate audit performed by the VA's Office of Inspector General. (*Id.* ¶¶ 102–03.) Harris had submitted audit action plans late in December 2016, January 2017, and March 2017. (*Id.* at 14, ¶ 113.) Furthermore, her action plans revealed that she and her staff were not performing certain audits, such as to ensure that bedridden patients were being turned and repositioned to avoid pressure ulcers. (*Id.* ¶¶ 114–17.) Harris's explanation for failure to perform these audits was "lack of time." (*Id.* ¶ 118.) As for audits Harris did perform, they contained errors such as "document[ing] that 7 veterans had prevelon boots in place (to prevent pressure ulcers) when only 4 veterans in the unit had prevelon boots," and "document[ing] more veterans with assistive eating devices then were actually present in the unit." (*Id.* ¶¶ 123–25.) Moreover, the LTCI had returned in December 2016 and "again found, just as it had found the year before, that the Denver CLC did not maintain adequate infection prevention and control programs." (*Id.* ¶ 122.) All of these issues and more were the justification (in Harris's view, the pretextual justification) for Knight's March 2017 fact finding. (*See id.* at 13, ¶¶ 102–03; ECF No. 88 at 1–3, 32, 35.)

## H. Formal Discipline

### 1. Original Recommendation (Winters)

The written report of the March 2017 fact finding went to Winters, which he

---

[5] Harris alleges that the delay—whatever its cause—"violate[d] the VA's Progressive Disciplinary Policy." (ECF No. 88 at 7.) But Harris does not explain the violation.

considered alongside the November 2016 report; e-mails he had obtained from Knight showing exchanges between Knight, Harris, and others; documents he had obtained himself when investigating the potential hiring of the Candidate; and "various other documents relating to [Harris's] conduct and job performance." (ECF No. 86 at 17, ¶ 150.) Winters concluded "that the evidence supported four charges: a Prohibited Personnel Practice, Failure to Follow Supervisory Instructions, Careless Performance of Job Duties, and Lack of Candor." (*Id.* ¶ 151.) Winters then consulted a VA document called "the Table of Penalties" to see what level of discipline would be appropriate. (*Id.* ¶ 153.) The Table of Penalties says that "removal [*i.e.*, firing] can be an appropriate penalty for committing a 'Prohibited Personnel Practice,' even for a first offense." (*Id.* ¶ 154.)[6] Winters also considered mitigating factors such as length of service and lack of previous discipline. (*Id.* ¶ 155.) Winters determined that removal was a justifiable penalty, if that is what the responsible decisionmaker, known as the "Proposing Official," chose to pursue. (*Id.* ¶ 156.)

Winters says that his determination was based entirely on his professional judgment and objective assessment of Harris's conduct, and that he was not motivated in any manner by Harris's age. (*Id.* ¶¶ 157–58.) Harris disputes this (ECF No. 88 at 9–10), but that dispute is presently immaterial for reasons explained below.

### 2.    Formal Proposal to Terminate Harris's Employment (Harmon)

The Proposing Official under the circumstances was Keith Harmon—the person

---

[6] Harris purports to deny this, but instead of explaining and supporting the denial, she asserts again that "the Progressive Discipline Policy . . . plainly was violated by the VA for incidents of alleged misconduct which occurred in September 2016," apparently referring (erroneously) the October 2016 incident regarding the Candidate. (ECF No. 88 at 9.) Again, Harris does not explain how the Progressive Discipline Policy was violated. (*See* n.5, above.)

to whom Harris had complained in September 2016.  (ECF No. 86 at 18, ¶¶ 159–60.)  Harris claims that Harmon should not have been the decisionmaker given his previous involvement, but she does not deny that Harmon was considered the "Proposing Official," administratively speaking.  (ECF No. 88 at 10.)

Winters gave Harmon a draft of the proposed charges and the full evidence file.  (ECF No. 86 at 18, ¶ 161.)  Harmon was persuaded that Harris "had preselected a candidate for an open nursing position who was the daughter of a nurse in her unit, and that she had chosen this candidate over other qualified veterans and a current VA employee."  (*Id*. at 19, ¶ 163.)  Harmon "did not find [Harris's] explanation that she was not finished with the selection to be credible."  (*Id*. ¶ 164.)  After "consider[ing] all of the evidence before him, including [Harris's] explanation for her conduct . . . and the Table of Penalties," Harmon decided that removal was the appropriate penalty.  (*Id*. ¶¶ 165, 167.)  Harmon says that age had no role in his decisionmaking process.  (*Id*. ¶ 166.)  As with Winters, Harris disputes this (ECF No. 88 at 10), but that dispute is also presently immaterial for reasons explained below.

### 3.    Final Action to Terminate Harris's Employment (Hanfelder)

Harmon issued a memorandum on July 12, 2017, proposing to remove Harris.  (ECF No. 86 at 19, ¶ 167.)  That memorandum went to Sallie Hanfelder, Executive Director of the VA Eastern Colorado Healthcare System.  (*Id*. at 19–20, ¶¶ 167–68, 170.)  Hanfelder "was the deciding official whenever a manager proposed to remove any non-probationary employee from federal service."  (*Id*. at 20, ¶ 169.)  As Harmon had received from Winters the proposed charges and the evidence file, so Hanfelder received the same from Harmon, as well as written responses from Harris to Harmon's July 12, 2017 memorandum.  (*Id*. ¶¶ 171–73.)  At some time in July 2017, Hanfelder

also met with Harris personally to discuss the charges and Harris's defense. (*Id.* ¶ 174.) The parties dispute whether Hanfelder properly weighed the evidence available to her. (*Compare id.* at 21–25 with ECF No. 88 at 11–12.) Again, for reasons explained below, this dispute is presently immaterial.

Hanfelder decided to sustain all four of the charges drafted by Winters, and further decided to terminate Harris, which she announced through a memorandum dated August 2, 2017. (ECF No. 86 at 25, ¶ 212.) Her decision was not based on Harris's age. (*Id.* ¶ 214.)[7]

## III. ANALYSIS

Harris asserts three theories of relief: age discrimination (termination due to age), age discrimination (hostile work environment), and retaliation for complaining about age discrimination. (ECF No. 69 at 12–14.) The VA moves for summary judgment on all of these claims. The Court will discuss them in turn.

## A. Age Discrimination: Termination Due to Age

It is undisputed that Hanfelder made the decision to terminate Harris, and Hanfelder did not have Harris's age in mind when she made that decision. Moreover, Harris makes no argument that Hanfelder recognized Knight's alleged age bias. Harris thus relies on the "cat's-paw" theory of discrimination, "meaning that [she seeks] to hold [the VA] liable for the animus of a supervisor [*i.e.*, Knight] who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011). More specifically, she argues that Knight was motivated by age bias to drive

---

[7] Harris nominally denies this but offers no evidence or argument that Hanfelder made her decision with Harris's age in mind. (ECF No. 88 at 12.) Hanfelder's lack of age bias is therefore deemed undisputed.

Harris out of the Denver CLC by ensuring that Harris would perform poorly enough to justify her termination. (*See* ECF No. 88 at 3 & n.2, 31, 35.)[8] More succinctly, Harris says that Knight "set [her] up in order to get rid of her." (*Id.* at 24.)

"[T]o survive summary judgment when asserting [this] cat's-paw theory of liability," Harris must "show that there is a genuine issue of material fact that (1) [Knight] took action motivated by discriminatory animus; (2) [Knight] intended the action to cause an adverse employment action, and (3) [Knight's] actions proximately caused the intended adverse employment action." *Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019). The Court will discuss each element in turn.

### 1. Discriminatory Animus

The undisputed facts, and the adequately supported disputed facts seen in the light most favorable to Harris, are enough for a factfinder to conclude that Knight held some sort of animus against Harris. (*See* Parts II.C & E, above.) But does Harris have evidence that Knight's animus arose from Harris's age? The Court finds that at least the following accusations, if credibly supported at trial, would be enough for a circumstantial inference of age bias.

First, Knight told Harris that Harris "would not be able to operate in the environment [Knight] was going to create." (ECF No. 86 at 32, ¶ 269.) Knight used the term "fast-paced" or "dynamic" to describe that environment. (*Id.*)

Second, Knight treated the younger staff respectfully. (*See* ECF No. 86-2 at 187–90.)

---

[8] Despite her attempts to accuse Winters and Harmon of age bias, Harris focuses her cat's-paw arguments exclusively on Knight. (*See id.*) Accordingly, for present purposes, the Court can disregard Harris's claims that Winters and Harmon were also age-biased.

Third, Harris was in her late 60s at the time and was near or at the top of the age spectrum among Denver CLC employees. (*Id.* at 191.) Indeed, she was at least twenty years older than most other Denver CLC employees. (*Id.*)

The Court does not mean to say that these three accusations are the only accusations Harris might be able to prove to support her claim that Knight was age-biased, nor that the forthcoming trial will be limited to determining whether these accusations are true. The Court holds only that there is at least one avenue for Harris to prove Knight's alleged age bias, and so summary judgment is not appropriate on this element of Harris's claim.

2. <u>Intent to Cause an Adverse Employment Action</u>

The next question is whether Harris has evidence from which a reasonable factfinder could conclude that Knight intended to cause an adverse employment action. In this regard, Harris pursues two theories: (1) the charges related to the Candidate (*i.e.*, the "Prohibited Personnel Practice" and lack of candor) arose from "Knight's false accusations and claims," which Knight intended to be "used to structure the [November 2016] Fact Finding [and] ultimately be utilized to remove Harris" (ECF No. 88 at 6); and (2) Knight intentionally harassed and overloaded Harris so that she would perform poorly in her job duties, thus creating a record that would justify termination (*id.* at 22–24).

The Prohibited Personnel Practice charge raises interesting questions. Knight did not "set [Harris] up" (*see id.* at 24) to designate the Candidate as "selected" (in two different places) before a selection had actually been made, nor to fail to fill out the appropriate forms for all candidates, nor to disregard veterans' and current-employee preferences. (*See* Part II.D, above.) Harris did these things herself. She now says she

did them out of "enthusiasm for [the Candidate]" (ECF No. 88 at 21), but the fact remains that she did them, and she does not allege that this "enthusiasm" is somehow attributable to Knight's actions. Thus, Harris's claim must be that she would not have been disciplined for the Prohibited Personnel Practice but for Knight investigating further and ensuring (in some unspecified way) that a fact finding would take place.

For now, the Court need not resolve whether Knight's reaction to the Prohibited Personnel Practice is enough to show her intent to cause Harris's termination. Harris's termination ultimately resulted from a number of charges, some unrelated to the Prohibited Personnel Practice. Among those charges was careless performance of job duties. Much of the record for that arose from Knight's own March 2017 fact finding which focused largely on Harris's inadequate audits. Assuming the evidence as presented at trial is credible, a reasonable factfinder could conclude that the results of the March 2017 fact finding flowed from Knight's intentional overloading of Harris, such that Harris was bound to perform poorly. This is particularly true considering that Harris had no disciplinary history at the VA for her first approximately ten years of employment there (*see* ECF No. 86-10 ¶ 53), and then, over the course of about a year working with Knight, she developed a disciplinary history that supervisory officials above Knight deemed severe enough to warrant considering immediate termination.

Thus, Harris has enough evidence to merit a trial on whether Knight intended to set Harris up for termination.

3.    Proximate Cause

"If a final decisionmaker"—here, Hanfelder—"fires an employee based on uncritical reliance on facts provided by a biased subordinate, the subordinate's bias is the proximate cause of the employment action." *Singh*, 936 F.3d at 1038 (internal

quotation marks omitted).  An employer can "break [that] causal chain" if "another person or committee higher up in the decision-making process . . . independently investigate[s] the grounds for dismissal."  *Id.* (internal quotation marks omitted).

> But simply *conducting* an independent investigation does not automatically immunize an employer from liability under the cat's-paw theory.  A subordinate supervisor's biased input may still be a proximate cause of the adverse action if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.

*Id.* at 1039 (internal quotation marks omitted; emphasis in original).

Interestingly, although Hanfelder has every motivation to say so if it is true, she never says that she would have terminated Harris for the Prohibited Personnel Practice alone (which arguably has no connection to Knight's treatment of Harris).  She instead says that her decision to terminate Harris was based on the "totality of the evidence presented to me."  (ECF No. 86-10 ¶ 59.)  That evidence necessarily included the evidence generated directly by Knight through the March 2017 fact finding, and generated indirectly by Knight through Harris's failings allegedly attributable to Knight's actions that allegedly set Harris up to fail.  (*See* ECF No. 86 at 13–23, ¶¶ 102–03, 150, 152, 172, 187–95.)

Accordingly, the VA has failed to make a record "that the adverse action was, apart from the supervisor's recommendation, entirely justified," *Singh*, 936 F.3d at 1039 (internal quotation marks omitted), much less that a reasonable factfinder could only conclude as much.  The VA is not entitled to summary judgment on Harris's termination-due-to-age cause of action.

## B.  Age Discrimination: Hostile Work Environment

Harris may prove that she was subject to a hostile work environment on account

of her age by proving: (1) she is 40 or older; (2) she was subject to unwelcome harassment; (3) the harassment was based on age; and (4) the harassment altered a term, condition, or privilege of her employment and created an abusive working environment. *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263 (10th Cir. 2005). Harris treats this cause of action in a somewhat confusing manner because, although the VA does not challenge the fourth element for purposes of summary judgment, she alleges that the element is satisfied because her "discharge is an adverse employment action." (ECF No. 88 at 35.) In other words, as argued in summary judgment briefing, it is not clear what difference Harris sees between her hostile environment claim and her termination-due-to-age claim.

In any event, the VA argues that Harris cannot persuade a reasonable factfinder that she was subject to severe or pervasive harassment, or that any such harassment was due to her age. (ECF No. 86 at 36–38.) For the reasons already explained in the termination-due-to-age context, however, the Court finds that Harris has evidence from which a factfinder could conclude that Knight hoped to make Harris's life awful at the Denver CLC, which is consistent with an intent to drive her out; and there is evidence that Knight did so because she believed Harris was too old to perform her job. This evidence is largely the same evidence that would come in to support the termination-due-to-age claim, which is going forward in any event. Accordingly, the Court finds it imprudent at this stage to determine whether the evidence could also support a hostile work environment claim. This can be much more cleanly addressed through preliminary and final proposed findings of fact and conclusions of law, *see* WJM Revised Practice Standards IV.B.7 & V.J, and/or oral argument at trial, in preparation for which the parties

will (presumably) have considered thoroughly how Harris's hostile work environment claim differs, practically speaking, from her discriminatory discharge claim.

For these reasons, the Court denies summary judgment to the VA on Harris's hostile environment claim.

## C.    Retaliation for Complaining About Age Discrimination

The ADEA prohibits not only age discrimination, but discrimination on account of "oppos[ing]" age discrimination.  29 U.S.C. § 623(d).  The latter gives rise to a "retaliation" claim.  A prima facie case of retaliation requires the plaintiff to show that: (1) the plaintiff engaged in protected opposition to discrimination; (2) the plaintiff then suffered an adverse employment action; (3) a reasonable employee would have considered the challenged employment action materially adverse; and (4) a causal connection existed between the protected opposition and the materially adverse action. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008).  The VA argues that Harris cannot prove a retaliation claim because, assuming she complained about "discrimination" (*see* Part II.C, above), she believes she was treated just as poorly after those complaints as she was before.  (ECF No. 86 at 38–39.)

Harris has had trouble in this lawsuit articulating a coherent retaliation claim. (*See* ECF No. 68 at 9–10 ("the Court does not understand what Harris is attempting to allege [through her retaliation claim]," given language in a previous complaint that "age" was the "motivating factor to retaliate against her," thus making the retaliation claim look indistinguishable from a direct discrimination claim).)  However, similar to the Court's treatment of the hostile environment claim, the Court finds it imprudent to decide at this juncture whether Harris can prove a retaliation claim.  The evidence to support such a claim largely overlaps with the evidence she will use to support her other claims.

For these reasons, the Court denies summary judgment to the VA on Harris's retaliation claim.

## IV.  FORM OF TRIAL

In the Final Pretrial Order, Harris asserts, without explanation, that "[t]rial in this Case will be to a Jury."  (ECF No. 96 at 29.)  The VA counters that "[a]ny trial on [Harris's] ADEA claims would be to the Court," whereas Harris's "single Rehabilitation Act claim may be triable to a jury."  (*Id*.)  When the Court set a trial date, it stated that "[w]hether the trial will be to a jury or the Court will be determined by a subsequent Order of the Court."  (ECF No. 97.)

Harris no longer has a Rehabilitation Act claim.  She abandoned that claim when she filed her Third Amended Complaint.  (*Compare* ECF No. 28 *with* ECF No. 69.)  She acknowledges as much in the Final Pretrial Order, where she describes claims arising only under the ADEA.  (*See* ECF No. 96 at 8–10.)

The Seventh Amendment jury trial right does not override the federal government's sovereign immunity, and Congress, in waiving sovereign immunity to ADEA suits, "did not intend to confer a right to trial by jury on ADEA plaintiffs proceeding against the Federal Government."  *Lehman v. Nakshian*, 453 U.S. 156, 165 (1981).  Accordingly, trial will be to the Court.

Finally, the Court strongly encourages the parties to consider private mediation or to jointly request a settlement conference before the Magistrate Judge in an effort to resolve this matter without the need for a trial to the Court.

## V.  CONCLUSION

For the reasons explained above, the Court ORDERS as follows:

1.    the VA's Motion to Dismiss Claim Three of the Third Amended Complaint (ECF

      No. 74) is DENIED AS MOOT;

2.    the VA's Motion for Summary Judgment (ECF No. 86) is DENIED; and

3.    This case REMAINS SET for a Final Trial Preparation Conference on March 6,

      2020, at 2:00 PM, and a five-day bench trial beginning on March 23, 2020, at

      8:30 AM, both in Courtroom A801.

      Dated this 3rd day of January, 2020.

                                                    BY THE COURT:


                                                    _____
                                                    William J. Martínez
                                                    United States District Judge